Please be seated. Thank you. Madam Clerk, please call the first case. May it please the Court. Good morning, Your Honors. Ms. Pyler. Before I took the podium this morning while awaiting your arrival, I sent a silent prayer to St. Jude. Those of you who are not familiar with St. Jude should be aware that he's the patron saint of hopeless cases. And as I read this brief— Is this a subtle message for us? You know, subtlety has never been one of my strengths. I think you're aware of that, but that's a discussion for another time. In any event, Mr. Delgado falls from a scaffold of anywhere from 6 to 10 feet, depending on what piece of the evidence you look at. He suffers transverse fractures of his spine. He's discovered with having a large subdural hematoma on the left side of his head. There is some discussion about whether he lost consciousness or not lost consciousness, but the fact of the matter is the emergency room records certainly delineate what the end result—the objective findings. So then Mr. Delgado begins his odyssey in the realm of workers' compensation and the medical milieu that it constructs and pretty much defines. He goes to a chiropractor, Victor Gutierrez, obviously because he speaks Spanish. And when you read the record, and I know you have and had it summarized, you reflect upon the fact that Mr. Gutierrez, a longstanding employee of the respondent, is not what we would consider the most intellectually facile individual. But he is a hardworking family man. He's a steady employee. Even Mr. Halim, his supervisor, his boss, the owner of the company, said that he knew him for 25 years, that he was a reliable guy. So what happens with Mr. Delgado? Well, as the record reflects, he meanders his way through various practitioners who conclude various findings, none of whom challenge the causal connection, the relationship between his complaints and the actual injury. Finally, in October of 2007, along comes Dr. Shapiro, who examines this man and focuses almost entirely on the fact that there's four out of five Waddells. And as we've seen before, and I know this Court has addressed this issue. In fact, I've used it several times in arguments of my own because I put the Waddell study into evidence together with his response when it's designed to be a truth predictor. A truth predictor. Guy falls eight feet, suffers various fractures, has significant stenosis by everybody's determination. But Shapiro says, you know, I don't know. I just can't find to believe this guy. And at this point in my argument, I'm thinking in the back of my head, boy, I'm climbing a huge mountain here. I wish I had a Sherpa to help me, but I don't. So the bottom line is this. Let's assume for this set of facts. Let's assume for this gentleman's injury that all of the doctors are right. That this man healed from this event, was capable of returning to work within certain restrictions. And of course, Dr. Shapiro, as you know, said go get an FCE. The only reason I can think of that Dr. Shapiro would make that recommendation was he knew in his heart, he knew in his mind that this guy was not capable of full duty at the age of 62 when he finally encountered him. So he gets the FCE done. The FCE is done in a way that delineates all of the elements that are going to inhibit him from going back to his prior level of occupation. And then lo and behold, out of nowhere, despite the fact that other doctors had recommended that he could return to work with light duty, never a job offer, 25-year employee, well-known to the owner, they didn't reach out to him. It isn't until after they get the FCE done. Now, who didn't reach out to him? Well, under Illinois law, the petitioner's required to send in duty disability notes, work status notes. Well, wasn't he working for Haleem and then he just left? No, that didn't happen, Your Honor, until subsequent to the FCE done in April of 2008. What I'm suggesting is that Dr. Gutierrez and Dr. Morgenstern also had released him to light duty work. He is required by law in order to get the compensation to send those work duty notes. So Mr. Haleem would have been aware that he was capable of working 20 pounds. In fact, if you look at his testimony, he says he could have been a supervisor. So when he comes back to work, when he goes back to work, because we all know that his own opinion of his body habitus, his symptoms, his condition, of ill-being is always going to be suspect because there's always an assumption of fraud that these people are fakers and phonies even though he worked 25 years, fed his family, was a good employee even by his own boss's standards. He shows up and what does he do? You've read the testimony. You saw the actions that he had to do. He was plastering. Now, I'm no plasterer. I'm no taper. I shudder to think of even attempting to do that. But the fact is those of us who have witnessed that or observed it know that taping and plastering requires a lot of bending and stooping and moving up and down. The petitioner did admit, I didn't have to carry my tools. He did that for a day and a half. He testified that his symptoms got so bad he didn't know where to turn. Mr. Alexi, what did Dr. Aberbush opine? Dr. Aberbush said that this man's radiculopathy was more polyneuropathy and that it was related to his diabetes as opposed to a pure radiculopathy. But here's the interesting point about that. The discarded, disregarded testimony and evidence, rather, of the test, the seminal test for determining whether or not there's a lumbar spine problem was the myelogram. And there was a complete blockage at L4-5, a complete blockage. That's a pretty significant cause of symptoms relating to radiculopathy and low spine problems. And again, I know I'm asking for a great deal because I want you to overturn the decision of the Industrial Commission. By the way, the three commissioners didn't even give us any insight or any benefit of what their thoughts were with regard to medical, two-doctor choice, causal connection. In fact, the decision of the arbitrator, which they embraced, has a divisiveness in it, doesn't it? Because in the order form, the arbitrator says this is causally related. In the body of the, as I think the arbitrator called it, the addendum to the decision, he finds no causal connection. So right now, we're faced with this situation. We've got an order that says, confirmed by the commission, confirmed by the circuit court, this is related to that fall off that scaffold. In the body of it, we have it is not related. Now, how in God's name can we parse that kind of a fine-lined decision with regard to causal connection? Logic would indicate, and the chain of events kind of proposal would simply say, if we eliminate all of the physicians for a moment and just look logically at the sequence of events, one certainly would understand that a man who is 60 years old, 58 at the time of the injury, but ultimately 60, 61 when he gets this myelogram, is going to have some residual problems. How is that supported? It's supported by David Shapiro saying, let's get an FCE. It's supported by the FCE, which shows he's got significant limitations. Both Belmonte and their Volk expert both testified it would be impossible. Well, I take that back. That's a misstatement. It would be very difficult to place this man. He's got a third-grade equivalent education. He doesn't speak English. Mr. Belmonte testified he was functionally illiterate. It's not his fault. He worked 25 years, supported his family, did what people are supposed to do. But this arbitrator, in deciding that he went to too many doctors, totally ignoring the definitive test of the myelogram, which is not controlled by anybody, which clearly shows a complete blockage at the L45 level, how does one conclude, A, that there's no causal connection, B, that this guy is a prime candidate to return to work? And if Mr. Haleem wanted this guy back to work, if he truly could have offered him a supervisory job, one has to wonder, and I know this goes into credibility, and, you know, they get to flip the coin and decide which way they want to go, but let's use common sense. If he really trusted him, really valued his employment, just tell him, look, Delgado, just go to the site and watch the boys. Make sure they don't do anything. But take it easy, because I got this thing from the insurance company, and it says you've got all these limitations. But gratuitously he testifies, hey, I would have given him anything he wanted. I would have had a car sent and picked him up. Hyperbole on my part, not in the record. I ask your pardon. The fact of the matter is, the outcome of this case, based upon the nature of the injuries, based upon the age, education level of this individual, must, this case must be reversed. This is an unjust result. And I'm not complaining about the money. I'm complaining about the fact that this guy has been given no credibility whatsoever, despite a pretty significant and encouraging background, given his work life, that he just decided, okay, I'm going to become a jerk and I'm going to wait for the pot of gold to come. We know there's no pot of gold. This needs to be reversed, especially because there's this dichotomy of it is connected, it's not connected. And we've got a definitive test, an objective measurement, that shows he's got significant pathology, which Dr. Lorenz said should be surgically reduced. He's fearful of it. Does that mean we throw him on the heap, say here's some bucks, 125 weeks of comp, he'll disappear? Thank you, Your Honors. Any questions? No. Thank you, Counsel. Counsel, you may respond. Thank you, Your Honors. I'm Valerie Piler. I represent the employer in this matter. Counsel. This is a classic case, Your Honors, of a manifest weight case. And it involves the commission weighing the credibility and the expertise of medical experts, vocational experts, and the employer and employee. Because there is ample evidence in the record to support the commission's determination, it should be affirmed. Counsel noted the issue particularly as to causation. If you look at the corrected decision of the arbitrator, it is consistent that there is a causal connection. The real question before the arbitrator and commission was what was the extent of the causal connection. And the commission found clearly by its award of 25% loss of the man as a whole that Petitioner did sustain injuries. And this is the kind of award, especially for an older case, that is usually associated with a surgery, which was not present here. So the commission clearly took the nature of the injuries sustained and caused by the accident seriously. What the commission did not agree with was that all of the treatment from Dr. Kelly and Dr. Lorenz and all of the diagnoses, including the lumbar myelogram that showed the complete blockage at L4, L5, which was done by Dr. Lorenz, they found that that was not relevant. And the reason is because the first three treating physicians found none of that. And not only did those treating physicians find none of it, none of the diagnostic tests showed that. So while they do a myelogram, they did not. But obviously, Your Honor, they did not feel that a myelogram was needed at that point. In fact, if you look at the original records, the L4, L5 level was not even initially involved. The initial diagnostic test showed a chronic L5, S1 radiculopathy. There was no reference to any L4, L5 impairments. So the commission looked at this period of treatment by Petitioner's choices of physicians, and they then saw the gap in treatment and they saw the change in condition. Dr. Morgenstern had issued a report indicating the neck pain had resolved, the headaches had resolved, much of the lumbar issues had resolved, he had only minimal tenderness, and suddenly the headaches are back, the cervical spine stuff is back, and we have a new lumbar disc. So the commission clearly found that these were not related because of the findings. So you're not disputing the myelogram results, the lumbar disc, that you're saying that that finding could lead to the symptomology that the claimant is experiencing, was experiencing at the time of arbitration? Well, actually, I believe, Your Honor, when they interpreted the L4, L5, the doctors actually said surprisingly he had very little symptomatology related to that blockage. They were quite, I think, surprised that there were no particular symptoms relating to that. And as I said, that was not even an issue in the first year and a half or two years of the claim. If you recall, Petitioner did not even see Dr. Lorenz. While there was a 10-month gap in treatment, it was actually two years almost from the, or more, from the date of accident to the first time Petitioner saw Dr. Lorenz. So when you look at the complete decision by the commission, you can see that they did a very careful, very thorough, very nuanced study of the medical evidence. They also looked at the testimony as between the employer and employee. And this goes to both the temporary total disability benefits and the permanent total disability allegations, which the commission rejected. Counsel notes that there was no offer of a job until such time as the FCE. And he impeaches or impugns Dr. Shapiro's ordering of it in the context of his opinions. My sense of what Dr. Shapiro did is that he had these Waddell findings. He didn't know what to make of it, so he said, let's get an objective test. I think that's the perfectly appropriate thing for a Section 12 examiner to do, to want as much factual information as possible on which to base a decision. So we do get the FCE, and at that point, we now know what the permanent restrictions are. And at that point in time, a job is offered. If we had been hounding Mr. Delgado to come back to work on all of these interim life duty jobs, Mr. Alexie would be up here telling you that we harassed him into coming back to work. We waited until we had a definitive determination of his abilities, and we offered him a job. And when you look at Mr. Halim's testimony, he clearly thought highly of this man. He was his supervisor. He ran his crew. So the idea that this was a made-up job, the idea that they wouldn't have adjusted this job to meet restrictions, is simply not supported by the record. And instead of asking for additional accommodations, and we have no idea what the actual facts of that job were, we only know plastering, rather than asking for additional accommodations or to be retained as a supervisor, Mr. Delgado just walks off the job and never returns. I have a question, just a practical question. He's getting TTD up to the time that he's asked to return to his employer, is that correct? Yes. Okay. Economically, is he getting the same paycheck package under TTD that he would if he's at work? He is getting essentially, Your Honor, the equivalent, because it's obviously tax-free and it has- It's the same paycheck. Correct. Correct. And in addition, I believe at that point he's also already on disability benefits. Okay. So the point being that he had a job, and that's the first reason the Commission found he was not permanently and totally disabled. The second reason is that the vocational expert testimony doesn't support an Odd Lot finding as well. Both Ms. Peters-Pagela and Mr. Belmonte said that they have placed individuals with these restrictions. And yes, both of them said it would be very difficult, but both of them said they had done it in the past, showing it could be done. Rather than Mr. Belmonte undertaking this process, he just simply rendered an opinion that Mr. Delgado would not be placeable. But this was not based on a labor market survey. It was not based on an assessment of transferable skills. It was based on Mr. Delgado's self-described employment as a manual laborer. If you look at Mr. Belmonte's opinions, nowhere in there does it take into account his supervisory skills, because they were clearly not made known to Mr. Belmonte in order to factor that into his equation. So with respect to the Odd Lot permanent total, again, the record clearly supports the Commission's decision. The Commission did look at both vocational experts' opinions. They did look at all of the evidence surrounding those, and particularly they looked at the fact that Mr. Delgado just walked off a job that his employer in good faith honestly tried to provide for him. For all those reasons, the Commission's findings with respect to permanent disability and with causation should be affirmed. If the Court has no other questions, I would stand on my brief with respect to the question of reasonableness of medical and the award of TTD. I would suggest, Your Honors, that the entire decision is supported by the record. It is clearly not contrary to the manifest way, and the Circuit Court's decision affirming the Commission's decision should itself be affirmed by this Honorable Court. Thank you. Thank you, Counsel. Counsel, you may reply. Your Honor, just two brief points. One is the fact that the monetary value of compensation, TTD as it's referred to, maintenance after he reaches stability, assumes that the man would be in a one-third tax bracket and that his earnings would not be calculated based upon an average but would really be calculated based upon what he was earning at the time. So in response to the question that you posed to Counsel, as soon as somebody gets hurt in this State, they take a pay cut. It's a burden on their family. I mean, that's the reality of the situation. Because the fact is you go back one year, as we know, we divide by the number of weeks, we average that, we eliminate overtime, we eliminate any additional funds available, so right away you start out in a bad position. And I think that the arbitrator, when he reviewed this information, especially if you look at the by-play that went on during the hearing and then his commentary in the award, seems to have concluded that, you know what, this guy had a good boss should he went back to work. All I'm saying is what about his right to be healed? What about his right to dictate whether or not he's capable of doing that? Do we eliminate that? Shapiro seems to imply when he ordered the FCE or directed that it should be gotten there, that's going to be a truth test. We're going to have a validity measure. Well, when you look at the FCE, they used three different approaches to secure validity and they confirmed that this was a valid representation of his activities. What were the biggest elements? Forget the lifting. Even Belmonte and the other lady commented on it. But the fact of the matter is his job, supervisor, his job was like the lead guy. He spoke Spanish. Everybody spoke Spanish. He'd been there for 25 years. God knows how long his coworkers. One of the witnesses didn't even see him that day. Saw him at the beginning and worked in a different apartment or a different room. And yet they used that testimony to try and show that this guy had this real easy job. So, again, tough burden. I know it's a tough issue. I know this court is very reluctant to reverse the commission on a manifest weight. But in this case, they got it wrong. Thank you. Thank you, counsel, both for your arguments. This matter will be taken under advisement. The written disposition shall issue.